[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

Nos. 15-10982 & 15-12077
_____

D.C. Docket No. 6:08-cv-00732-ACC-KRS


ROBERT IRA PEEDE,

Petitioner-Appellee,

versus

ATTORNEY GENERAL, STATE OF FLORIDA,
SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondents-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 8, 2017)

Before HULL, JORDAN, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Robert Peede is under sentence of death in Florida following a first-degree

murder conviction for killing his wife Darla Peede.  The district court partially

granted Mr. Peede's petition for writ of habeas corpus, *see* 28 U.S.C. § 2254, concluding that defense counsel was ineffective for failing to investigate and present certain background information about Mr. Peede at the penalty phase. The state appeals that ruling. Following a review of the record, and with the benefit of oral argument, we conclude that the state courts' resolution of the *Strickland* prejudice prong was not unreasonable, and therefore reverse the district court's grant of habeas relief.

## I

The Florida Supreme Court summarized the circumstances related to Darla Peede's murder as follows:

> The evidence at trial established that Peede returned to Miami to convince Darla [Peede's estranged wife] to go to North Carolina and serve as a decoy in an alleged scheme Peede had to kill his ex-wife [Geraldine Peede] and her boyfriend. Peede telephoned Darla and she agreed to pick him up at the airport. However, instead of returning to Darla's home as intended, they mistakenly got on the Florida Turnpike heading for Orlando. As they left the Miami area, Peede pulled a lock-blade knife and inflicted a superficial cut in Darla's side. Subsequently, outside of Orlando, Peede stopped the car, jumped into the back seat, and stabbed Darla in the throat. As a result of this injury, Darla bled to death. Peede was arrested in North Carolina before carrying out his scheme to murder his ex-wife, and he confessed to Darla's murder.
>
> After his trial and conviction, a jury recommended the death penalty. The trial judge followed the jury's recommendation and sentenced Peede to death, finding three aggravating factors and one mitigating circumstance. The trial court found in mitigation that Peede was under the influence of extreme mental or emotional disturbance, but attributed little weight to this finding. On appeal, this Court

2

affirmed Peede's conviction and, although we found that the murder was not cold, calculated and premeditated (CCP), we nevertheless upheld the death penalty.

*Peede v. State*, 748 So. 2d 253, 254 (Fla. 1999).[1]

In sentencing Mr. Peede to death, the state trial court found two statutory aggravating factors: (1) Mr. Peede previously was convicted in California of second-degree murder and assault with a deadly weapon; and (2) he murdered his wife Darla Peede during the commission of a kidnapping.[2]  The trial court also found, as a statutory mitigating factor, that Mr. Peede was under the influence of extreme mental or emotional disturbance when he murdered his wife.  But, it concluded it was only a "marginal mitigating circumstance" which was "outweighed by the single aggravating circumstance, standing alone, of Defendant's prior [California] crime of Murder in the Second Degree and Assault with a Deadly Weapon."  Sentencing Order, D.E. 19 at 1265.

The Florida Supreme Court upheld Mr. Peede's conviction and death sentence on direct appeal.  *See Peede v. State*, 474 So. 2d 808, 818 (Fla. 1985) (ruling that the "one marginal mitigating circumstance that [the trial court] found

---

[1]For clarity, we point out that Mr. Peede married his first wife, with whom he had one child, at age 16. *Peede v. State*, 995 So. 2d 480, 490 (Fla. 2007).  After his first wife left him a year later, Mr. Peede married Geraldine Peede and had two children with her. *Id.*  The victim, Darla Peede, was his third wife and estranged from him at the time of the murder. *Id.* at 486.

[2]The trial court also found that Mr. Peede murdered his wife in a cold, calculated, and premediated manner, but the Florida Supreme Court overturned that finding on direct appeal. *See Peede*, 474 So. 2d at 817.

3

was outweighed by the single aggravating circumstance standing alone of the defendant's previous convictions of two felony crimes involving the use or threat of violence to some other person").

After exhausting direct review of his conviction and sentence, Mr. Peede moved for post-conviction relief in state court. The state trial court ultimately denied his post-conviction motion after an evidentiary hearing, and the Florida Supreme Court affirmed. *See Peede v. State*, 955 So. 2d 480, 486 (Fla. 2007).

Mr. Peede then filed a petition for writ of habeas corpus in federal court. He alleged, among other things, that his counsel was ineffective at the penalty phase. Mr. Peede argued that his counsel unconstitutionally failed to present mitigation evidence (1) concerning his mental health, and (2) which showed he had a difficult background and upbringing. The district court agreed with Mr. Peede, vacated the death sentence, and ordered a new sentencing hearing. It concluded there was a reasonable probability that Mr. Peede would have received a different sentence had counsel presented the mitigating evidence:

> The total mitigation evidence after the evidentiary hearing included that Petitioner suffered from childhood illnesses, his parents were alcoholics, his mental health began to deteriorate after his mother's suicide, he suffered from Paranoid Personality Disorder and Delusional Disorder, he had a family history of mental illness, and he was behaving bizarrely prior to, and after, the California murder.
>
> Had the aforementioned additional mitigation evidence been presented, a reasonable probability exists that the jury would have determined that the prior violent felony aggravator (California

4

convictions) was mitigated, and thus warranted less weight. When considered with the remaining aggravator, that the murder occurred during the commission of a kidnapping, the aggravators were balanced or outweighed by the total mitigation evidence.

Order, February 27, 2015, D.E. 34 at 50–51 (ellipsis omitted).

This appeal followed.

## II

We review the grant or denial of a petition for a writ of habeas corpus de novo. *See Owens v. McLaughlin*, 733 F.3d 320, 324 (11th Cir. 2013). But our review is not plenary.

The Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214 (1996), governs Mr. Peede's habeas petition. His ineffectiveness claim was adjudicated on the merits by the Florida Supreme Court, so Mr. Peede may obtain relief only if that adjudication was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A state court decision is "contrary to" clearly established federal law when the state court "(1) applied a rule in contradiction to governing Supreme Court case law; or (2) arrived at a result divergent from Supreme Court precedent despite materially indistinguishable facts." *Dill v. Allen*, 488 F.3d 1344, 1353 (11th Cir.

5

2007). "A state court's application of clearly established law is unreasonable only if no 'fairminded jurist' could agree with the state court's determination or conclusion." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1257 (11th Cir. 2012) (quoting *Harrington v. Richter*, 562 U.S. 86, 101 (2011)).

Under § 2254(d)(2), a federal habeas court must accord the state court's factual determinations "substantial deference." *Brumfield v. Cain*, 135 S. Ct. 2269, 2277 (2015). It presumes that such findings are correct unless the petitioner rebuts that presumption by "clear and convincing evidence," *Parker v. Head*, 244 F.3d 831, 836 (11th Cir. 2001) (quoting § 2254(e)(1)). "If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the trial court's . . . determination." *Brumfield*, 135 S. Ct. at 2277 (internal quotation marks omitted).

Mr. Peede's ineffective assistance of counsel claim requires proof that (1) counsel's performance was constitutionally deficient, and (2) that such deficient performance resulted in prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). We may assume without deciding, as we do here, that counsel's performance was deficient, then move directly to whether the performance prejudiced Mr. Peede. *See, e.g.*, *Castillo v. Sec'y, Fla. Dep't of Corrs.*, 722 F.3d 1281, 1283–84 (11th Cir. 2013) (noting we may make

6

"simplifying assumptions in favor of the petitioner" to facilitate our analysis, including assuming deficient performance).

To demonstrate prejudice, Mr. Peede must show that, "but for his counsel's deficiency, there is a reasonable probability he would have received a different sentence." *Porter v. McCollum*, 558 U.S. 30, 41 (2009). A "reasonable probability" is one "sufficient to undermine confidence in [the sentence]." *Strickland*, 466 U.S. at 694. "To assess that probability, [we] consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (internal quotation marks and brackets omitted).

As noted, the Florida Supreme Court denied Mr. Peede's ineffectiveness claim on the merits. As a result, Mr. Peede can obtain relief only by satisfying the difficult § 2254(d) standard. See *Kokal v. Sec'y, Fla. Dep't of Corrs.*, 623 F.3d 1331, 1345–46 (11th Cir. 2010) (reviewing, with AEDPA deference, the highest state-court decision that decided petitioner's claim on the merits).

### III

We conclude that, even if Mr. Peede's counsel was deficient during the penalty phase, the Florida Supreme Court's ruling with respect to prejudice was not unreasonable. On this record, the district court should have deferred to the

Florida Supreme Court's conclusion that the new post-conviction mitigation evidence (including the mental health evidence) did not undermine confidence in Mr. Peede's sentence. The district court also should have deferred to the Florida Supreme Court's view that the new evidence concerning Mr. Peede's background and upbringing was a double-edged sword that likewise failed to undermine the sentence. The district court's grant of habeas relief was therefore error.

### A

The district court ruled that Mr. Peede's new mental health evidence mitigated his prior California convictions for second-degree murder and assault with a deadly weapon. In our view, the district court failed to defer to the Florida Supreme Court's reasonable conclusion to the contrary.

We begin by summarizing the California convictions. In California, Mr. Peede shot two strangers outside a bar, killing one and hospitalizing the other for several weeks. An eyewitness to the incident saw two men outside in a bar fight; one man hit the other with a pool stick, knocking him to the ground, then ran away. Shortly after someone came to the aid of the man on the ground, a van (driven by Mr. Peede) drove around the corner, slowed to almost a complete stop, and the driver (Mr. Peede) shot six times at the two men. Mr. Peede shot one victim in the head and torso, killing him, and shot the other victim in the shoulder.

8

Mr. Peede was convicted of second-degree murder for the death of the first man, and assault with a deadly weapon for the shooting of the second man.

At sentencing, the Florida trial court credited the opinion of defense expert Dr. Robert Kirkland, who explained that Mr. Peede was eligible for the statutory mitigator of being under the influence of extreme mental or emotional disturbance when he murdered Darla Peede.  Dr. Kirkland, a well-respected forensic psychiatrist in Florida at the time of Mr. Peede's trial, interviewed Mr. Peede twice before testifying during the penalty phase of Mr. Peede's trial.  During these two sessions, Dr. Kirkland and Mr. Peede discussed Mr. Peede's background, personal history regarding his health, his life and lifestyle, his marriages, his successes and his failures, and his previous problems with Geraldine and Darla Peede.  Based on these discussions, Dr. Kirkland concluded that Peede suffered from paranoia and delusions, specifically regarding suspected infidelity by Geraldine and Darla Peede and a belief that they had posed nude and advertised for sex in a "swingers" magazine.  Dr. Kirkland testified that Mr. Peede's paranoia "played a large part in Darla's death," and that Mr. Peede was under the influence of an extreme mental or emotional disturbance at the time of the murder.

But, as noted, the trial court also concluded that this mitigator was substantially outweighed by Mr. Peede's prior California convictions for second-degree murder and assault with a deadly weapon:

9

The crime for which Defendant is to be sentenced was committed while the Defendant was under the influence of extreme mental or emotional disturbance.

Viewing the testimony of Dr. Robert Kirkland that the Defendant experienced a specific paranoia that the victim and his ex-wife, Geraldine Peede, were posing in nude magazines, the Court, giving the Defendant the benefit of the doubt, will consider it a mitigating circumstance. The Court also considered the rest of Dr. Kirkland's testimony and observed that this particular paranoia, had the facts been true, would not have called for or excused violent acts of the Defendant. Based on the totality of Dr. Kirkland's testimony, which included his opinion that the Defendant chose to act violently although capable of understanding the nature and consequences of his acts and to conform his conduct to the law, I find that although a marginal mitigating circumstance, it is outweighed by the single aggravating circumstance, standing alone, of Defendant's prior crime of Murder in the Second Degree and Assault with a Deadly Weapon.

Sentencing Order, D.E. 19 at 1265.

At the state post-conviction hearing, Mr. Peede introduced new evidence and expert testimony aimed at demonstrating that, had defense counsel given Dr. Kirkland more information about Mr. Peede's background, including information concerning his mental health prior to the California shooting, there was a reasonable probability he would not have been sentenced to death.

As noted, the district court agreed. The court reasoned that the new mental health evidence probably would have mitigated the California convictions, so the failure to uncover and introduce that evidence during the penalty phase caused Mr. Peede prejudice under *Strickland*. *See* Order, D.E. 34 at 50–51 ("Had the aforementioned additional mitigation evidence been presented, a reasonable

10

probability exists that the jury would have determined that the prior violent felony aggravator (California convictions) was mitigated, and thus warranted less weight.").

We respectfully disagree. The district court should have deferred to the Florida Supreme Court's view of the new mental health evidence and expert testimony. The Florida Supreme Court concluded:

- "Although it is true that Dr. Kirkland did not have available to him Peede's records or other background information the evidentiary hearing experts had at their disposal, Dr. Kirkland arrived at conclusions similar to the current experts' findings." *Peede*, 955 So. 2d at 495.

- Dr. Kirkland "provided evidence favorable to Peede in that he opined that the extreme emotional disturbance mitigator applied in Peede's case, and the trial court agreed." *Id*. at 494 (citations omitted).

- "Dr. Kirkland's essential views would not have changed, and further, the mitigator of extreme mental or emotional disturbance was considered by the trial court due to Dr. Kirkland's testimony. In fact, the experts at the evidentiary hearing essentially agreed with many of Dr. Kirkland's main findings." *Id*. at 486.

- "[A]lthough Peede's experts believed the trial court should have found the mitigator regarding capacity to conform conduct to the requirements of the law, the circuit court was within its discretion to agree with the expert witnesses who did not share this belief." *Id*. at 494.

- The post-conviction trial court correctly found that "much of the difference between Dr. Kirkland's conclusions and those of the current defense experts is semantic." *Id*. at 495 (quoting trial court).

11

The Florida Supreme Court consequently reasoned that there was "no error by the trial court in concluding that Peede has not demonstrated prejudice." *Id*. Our review of the record gives us no basis to disturb that conclusion under AEDPA.

At bottom, the Florida post-conviction court made findings, adopted by the Florida Supreme Court, to which we must give deference. *See Bottoson v. Moore*, 234 F.3d 526, 534 (11th Cir. 2000) ("When there is conflicting testimony by expert witnesses, as here, discounting the testimony of one expert constitutes a credibility determination, a finding of fact." (citation omitted)). Mr. Peede's post-conviction hearing involved dueling state and defense expert witnesses. The state's experts opined, consistent with Dr. Kirkland's testimony at trial, that despite the new mental health evidence, Mr. Peede knew right from wrong and could control whether he committed murder. State expert Dr. Frank testified that Mr. Peede's mental illness did not prevent him from knowing the wrongfulness of his conduct, as evidenced by the fact that he tried to hide Darla Peede's body, hid the knife he used to kill Darla, knew to pull the car over before stabbing her, and was afraid of being caught. Similarly, state expert Dr. Merin determined that Mr. Peede knew the wrongfulness of his actions, noting that Mr. Peede's "behavior was goal-directed, coherent, and relevant," and "he was able to make decisions." The post-conviction trial court found the state experts' opinions credible, and gave

sound reasons for its findings. *See* Order Denying Amended Motion to Vacate Judgments of Conviction and Sentence, Aug. 12, 2004 at 2-8.

For example, the post-conviction trial court noted that the defense experts at the evidentiary hearing testified that Mr. Peede's delusional disorder was "narrowly circumscribed" to his beliefs about Geraldine's and Darla's infidelity. *Id.* at 2, 4. Thus, the post-conviction trial court found that "other than this mistaken belief regarding the infidelity of his former wives, Mr. Peede's thoughts are fully grounded in reality." *Id.* at 2. Furthermore, the defense experts testified that "Mr. Peede was prone to severe emotional outbursts, including violent outbursts that were completely unrelated to his delusions," and "there was nothing about the structure of Mr. Peede's delusion itself that would have prevented him from judging between right and wrong." *Id.* at 4. Accordingly, the post-conviction trial court found that the defense experts' opinion that Mr. Peede was unable to conform his conduct to the law "appear[ed] inconsistent" with their testimony that his mental state did not "affect his ability to tell right from wrong." *Id.* at 5. Finally, the post-conviction court found that "Dr. Kirkland's findings and conclusions did not vary materially from the findings and conclusions of the

defense's current experts."[3]  *Id.* at 3, 8.  Under AEDPA, Mr. Peede must rebut these findings with clear and convincing evidence.  *See Bottoson*, 234 F.3d at 534.

He has failed to do so.  Mr. Peede does cite new mental health evidence which shows that, at times, he had a paranoid and unstable disposition.  *See, e.g.*, Appellee's Br. at 46 (prior to the California shooting, a witness testified Mr. Peede became angry after missing a pool shot and "beat himself" in the face—"busted his mouth and bruised his eye up"); *id.* at 26 (Mr. Peede's aunt visited him while incarcerated in California, where he started crying and insisted she leave, telling her "they're going to kill you, go away"); *id.* at 44 (Mr. Peede's uncle described him as having "mental problems").  That evidence, however, fails to satisfy Mr. Peede's hefty burden of establishing that the Florida post-conviction court was clearly wrong in finding, among other things, that Mr. Peede knew right from wrong and could control whether he took the life of another.[4]

---

[3]Though not specifically mentioned by the post-conviction trial court, other evidence in the record also tends to support its credibility determination.  For example, as noted by the Florida Supreme Court, Dr. Sultan, one of Mr. Peede's post-conviction experts, opined "that any psychologist working to support the imposition of the death penalty was unethical."  *Peede*, 955 So. 2d at 491.  Dr. Sultan also admitted that she had been the subject of an investigation by the North Carolina Psychological Board, and though the investigation ultimately was dropped, the Board had cautioned her in several areas regarding her role as a psychologist testifying in forensic settings.

[4]Mr. Peede also cites a California Department of Corrections record which mentions schizophrenia and paranoid behavior while incarcerated.  *See* Appellee's Br. at 48.  But Mr. Peede's experts did not diagnose Mr. Peede with schizophrenia, and we fail to see how this document shows the Florida post-conviction trial court and the Florida Supreme Court were clearly wrong.

14

Mr. Peede's new mental health evidence largely confirms what most experts and lay witnesses seem to agree about: Mr. Peede could be a violent and angry man who had issues with jealously and paranoia, especially with women. *See, e.g.*, *Peede*, 955 So. 2d at 492 ("[T]he testimony of three conviction defense mitigation witnesses established that Peede had always been an angry and suspicious person and this evidence would not have been helpful to Peede."). Moreover, though more detailed, the new mental health evidence is largely consistent with Dr. Kirkland's penalty phase testimony that Mr. Peede experienced paranoia and delusions, specifically related to his wives' suspected infidelity, and that his paranoia played a role in Darla Peede's murder. Under AEDPA, therefore, Mr. Peede has not given us sufficient reason to disregard the Florida Supreme Court's conclusion that Mr. Peede was not prejudiced by counsel's failure to introduce this new, more detailed mental health evidence.

**B**

We also defer to the Florida Supreme Court's conclusion that there was no prejudice from counsel's failure to introduce evidence about Mr. Peede's background and upbringing. The Florida Supreme Court reasoned that the evidence was a double-edged sword that did not undermine confidence in Mr. Peede's sentence:

> The mitigating evidence Peede presented during the evidentiary hearing was his mother's suicide, his blistering skin condition as a

15

child, his paranoid behavior regarding his wives' alleged sexual exploits, and his feelings of inadequacy. While this evidence could indeed be seen as mitigating, this mitigation would have been offset by the testimony of Peede's aggressive and impulsive behavior towards women, including his hitting Nancy Wagoner prior to killing Darla, and his bizarre accusations to various friends and family of sleeping with his second wife, Geraldine. It appears that Peede's aggression has not subsided in the years since the murder either. This is illustrated by Peede's reaction when his counsel put his childhood friend John Bell on the stand during the evidentiary hearing; Peede accused him of fathering his youngest child and threatened that he would shoot Bell if he had a gun.

*Peede*, 955 So. 2d at 494.

The Florida Supreme Court concluded also that "the proffered mitigation evidence developed in the evidentiary hearing would have been countered by the substantial negative aspects of Peede's character and past brought out by the mitigation witnesses and by the established aggravators in this case." *Id.*

Mr. Peede challenges the Florida Supreme Court's view of the evidence, in part, by arguing that the trial court at sentencing "minimized [Dr.] Kirkland's opinion, including his conclusion that at least one statutory mitigating circumstance applied, precisely because Kirkland had not based his opinion on any review of the record." Appellee's Br. at 58. But Mr. Peede misreads the record. Nothing in the trial court's sentencing order suggests what Mr. Peede argues. Instead, the trial court weighed Dr. Kirkland's testimony, which included the conclusion that Mr. Peede "chose to act violently although capable of understanding the nature and consequences of his acts and to conform his conduct

16

to the law," and found "that although a marginal mitigating circumstance, it is outweighed by the single aggravating circumstance, standing alone, of the Defendant's prior crime of Murder in the Second Degree and Assault with a Deadly Weapon." Sentencing Order, D.E. 19 at 1265.

Our review of the record leads us to conclude that the Florida Supreme Court did not act unreasonably. Mr. Peede did introduce post-conviction evidence that, as the Florida Supreme Court observed, established his life was lined with difficulties leading up to the California shooting. But the new evidence also solidified that Mr. Peede had been an angry, suspicious, and sometimes violent man for a good portion of his life.

For example, before murdering Darla Peede, Mr. Peede was violent towards her and began to drink and smoke marijuana daily, which made him very paranoid. Even Mr. Peede's friends and relatives admitted that he was a violent person. Nancy Wagoner, his 71-year-old aunt, testified that Peede pushed her and caused her to fall shortly before he murdered Darla. John Bell, a childhood friend, testified that Mr. Peede had a bad temper growing up and would get very angry. In 1981, Mr. Peede falsely accused Bell of sleeping with Geraldine Peede—an allegation Mr. Peede repeated when Bell was called to testify at the evidentiary hearing, at the same time asking the court for a gun and threatening to kill Bell. A cousin, Michael Brown, testified that as a teenager, Mr. Peede was very aggressive

17

with women and would get mad and make disparaging remarks if they spurned his advances. Brown also recounted a road rage incident between Mr. Peede and another male driver, in which Mr. Peede drove erratically while yelling at the other driving, causing Brown to fear for his own safety. Brown further stated that Mr. Peede also falsely accused him of sleeping with Geraldine Peede.

This new mitigation evidence, therefore, posed a doubled-edge-sword dilemma—the new information could have hurt as much as it helped, not only because the information itself could be damaging, but also because of the risk that the witnesses' testimony would trigger a violent outburst from Mr. Peede, as occurred during Bell's hearing testimony. We have repeatedly ruled that this sort of post-conviction evidence is usually insufficient to warrant habeas relief. *See, e.g.*, *Evans v. Sec'y, Fla. Dep't of Corrs.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (deferring to state court's rejection of relief where new evidence was a double-edged sword because evidence can be more harmful than helpful); *Ledford v. Warden, Ga. Diagnostic & Classification Prison*, 818 F.3d 600, 650 (11th Cir. 2016) ("And there is a real danger that additional mitigation evidence, particularly if presented by testifying family members, would have been a 'double-edged sword,' which argues against a showing of prejudice." (citing cases)). We come to the same conclusion here.

## IV

18

For the reasons stated, we conclude the district court erred in granting Mr.

Peede partial habeas relief.

**REVERSED**.

JORDAN, Circuit Judge, dissenting:

This is a close and difficult case, but on balance I think the district court got it right on the issue of *Strickland* prejudice. I would affirm for the reasons set forth in pages 28–51 of the district court's thorough order, which are appended to this dissent. *See* D.E. 34 at 28–51.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ROBERT IRA PEEDE,

     Petitioner,

v.                                    CASE NO. 6:08-cv-732-Orl-22KRS

ATTORNEY GENERAL, STATE
OF FLORIDA, et al.,

     Respondents.

_____

## ORDER

This case is before the Court on the Petition for Habeas Corpus Relief (Doc. No. 1) filed by Robert Ira Peede.   Pursuant to the instructions of the Court, Respondents filed a Response to Petition for Writ of Habeas Corpus (Doc. No. 18).   Thereafter, Petitioner filed a Reply to the Response (Doc. No. 21).   As discussed hereinafter, the habeas petition is granted in part and denied in part.

I.     **STATEMENT OF FACTS**

The facts adduced at trial, as set forth by the Supreme Court of Florida, are as follows:

> Intent on getting Darla[1] to come back to North Carolina with him to act as a decoy to lure his former wife Geraldine and her boyfriend Calvin Wagner to a motel where he could kill them, Peede, on March 30, 1983, traveled from Hillsboro, North Carolina, to Jacksonville, Florida, on his motorcycle.   He sold his motorcycle near Ormond Beach, took a cab to the airport, and flew to Miami.   He attempted to call Darla at her daughter's

---

[1] Darla Peede, the victim, was Petitioner's third wife.

21

determination of the facts in light of the evidence presented at the state court proceedings. Accordingly, claim two is denied pursuant to 28 U.S.C. § 2254(d).

### C.   Claim Three

Petitioner asserts that counsel rendered ineffective assistance during the penalty phase of his trial.   In support of this claim, Petitioner argues generally that counsel failed to (1) investigate and call witnesses to testify concerning Petitioner's childhood and mental health history, (2) obtain and provide background information and records to the mental health expert, and (3) review and provide materials regarding Petitioner's prior felony convictions and incarceration in California to the mental health expert.

Petitioner raised this claim in his Rule 3.850 motion, and the state court conducted a hearing on the claim after which it denied relief.   The Supreme Court of Florida affirmed the state trial court's decision.   *See Peede III*, 955 So. 2d at 489-94.   In concluding that counsel's performance was not deficient, the state court reasoned that Petitioner failed to assist counsel by providing background information; nevertheless, counsel employed an investigator and interviewed Petitioner's family and friends.   *Id.* at 493.   As to counsel's failure to provide Dr. Kirkland with sufficient background information to allow him to adequately evaluate Petitioner, the state court determined that Dr. Kirkland was able to provide favorable testimony for the defense based solely on his two interviews of Petitioner.   *Id.*   The state court concluded, therefore, that counsel's performance, although imperfect, was adequate to meet the requirements of

28

*Strickland.   Id.* at 493.

The state court further determined that even if counsel was deficient, Petitioner failed to establish prejudice.   The state court reasoned:

> the proffered mitigation developed in the evidentiary hearing would have been countered by the substantial negative aspects of Peede's character and past brought out by the mitigation witnesses and by the established aggravators in this case.   Additionally, Peede has not demonstrated prejudice by Dr. Kirkland's lack of background information because Dr. Kirkland's essential views would not have changed, and further, the mitigator of extreme mental or emotional disturbance was considered by the trial court due to Dr. Kirkland's testimony.   In fact, the experts at the evidentiary hearing essentially agreed with many of Dr. Kirkland's main findings.   Although this Court found that the CCP aggravator was not supported by the evidence, the trial court found two other substantial aggravators based on Peede having been previously convicted of two felony crimes involving the use or threat of violence, one of these crimes being second-degree murder, and the murder being committed in the commission of kidnapping. In sum, we find no error by the trial court in concluding that Peede has not demonstrated prejudice, and we affirm the trial court's denial of this claim.

*Id.* at 494.

To determine whether counsel's performance was lacking at the penalty phase, courts must consider "'whether counsel reasonably investigated possible mitigating factors and made a reasonable effort to present mitigating evidence to the sentencing court.'"   *Stewart v. Sec'y, Dep't of Corr.,* 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Henyard v. McDonough,* 459 F.3d 1217, 1242 (11th Cir. 2006)).   "[C]ounsel's decision not to investigate and develop favorable evidence must be reasonable and fall within the range of professionally competent assistance.   Strategic choices to forego further

29

23

investigation into an issue are not deficient when a reasonable professional judgment based on a sufficient initial inquiry supports the decision to terminate the investigation." *Lynd v. Terry*, 470 F. 3d 1308, 1316-17 (11th Cir. 2006) (citing *Strickland*, 466 U.S. at 690-91). Counsel is deficient when he or she "'totally fails to inquire into the defendant's past or present behavior or life history' in a capital case. . . ." *Lynd*, 470 F.3d at 1317 (quoting *Housel v. Head*, 238 F.3d 1289, 1294 (11th Cir. 2001)); *see also Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (holding representation is deficient when counsel does not conduct sufficient investigation to formulate an adequate life profile of a defendant).

"To determine prejudice from the unreasonable failure to investigate and present favorable and/or mitigating evidence, '[federal courts] reweigh the evidence in aggravation against the totality of available mitigating evidence.'" *Ward v. Hall*, 592 F.3d 1144, 1165 (11th Cir. 2010) (quoting *Wiggins v. Smith*, 539 U.S. 510, 534 (2003)). The Court must "evaluate the totality of the available mitigation evidence – both that presented at trial and at the collateral proceedings." *Id.* (citing *Williams*, 529 U.S. at 397-98).

     *i.*    *Penalty Phase Evidence*

During the penalty phase, the State presented evidence of Petitioner's prior felony convictions involving the use or threat of violence: 1978 convictions for second degree murder and assault with a deadly weapon in California. (Ex. A-6 at 927-29, 934.) John Anderson ("Anderson"), the prosecutor from the California case, testified that the circumstances surrounding the convictions stemmed from an altercation in a bar between

30

Petitioner and the victims.    *Id.* at 931.    Petitioner shot one victim in the head and torso, killing him, and shot the other victim in the shoulder.    *Id.* at 932.    Anderson noted that friends and relatives submitted letters concerning Petitioner's sentencing that were part of the court record in the California case.    *Id.* at 935-36.    On cross-examination, Joseph DuRocher ("DuRocher"), one of Petitioner's attorneys, elicited testimony from Anderson that one of the arguments advanced by Petitioner in defense of the convictions was that he was coming to the assistance of a woman who was being ejected from the bar.    *Id.* at 938.    DuRocher also asked Anderson if the letters from Petitioner's family and friends were considered by the court in imposing Petitioner's sentence, and Anderson confirmed that they were.    *Id.*

Austin Backus ("Backus"), an eyewitness to the California shootings, testified that he observed two men involved in a fight outside a bar during which one of the men hit the other one with a pool stick and then ran away.    *Id.* at 941.    While the individual who had been hit with the pool stick remained on the ground in front of the bar, another individual came out of the bar to offer assistance to the man.    *Id.* at 942.    Several seconds later, a van came around the corner of the bar, slowed almost to a stop, and the driver of the van fired approximately six shots.    *Id.* at 943.

Defense counsel called Dr. Robert Kirkland as a witness.    Dr. Kirkland, a psychiatrist who had been practicing more than twenty years, testified that he evaluated Petitioner on two occasions.    *Id.* at 949.    Dr. Kirkland opined that when Petitioner

31

25

murdered Darla Peede, he was under the influence of extreme mental and emotional disturbance.   *Id.* at 950.   In reaching his opinion, Dr. Kirkland indicated that he considered both of his interviews with Petitioner and Petitioner's personal history regarding his health, life and life style, marriages, successes and failures, and previous problems, particularly in relation to his second and third wives.   *Id.* at 950-51.   Dr. Kirkland noted that sleep deprivation was a factor in Darla Peede's murder as Petitioner had been without sleep for two days at the time of the offense.   *Id.* at 951.   When asked if Petitioner had any recognizable mental illness, Dr. Kirkland responded:

> I felt, and I continue to feel, that Mr. Peede has certain, certain type of character structure that his maybe in lay terms, he's sort of a tough guy, macho, explosive at times.

> But I was most impressed with certain rather strong paranoid elements that developed into a scenario involving two wives, and which I think played a large part in Darla's death.

*Id.* at 951-52.   On cross-examination, the prosecutor questioned Dr. Kirkland regarding how he reached his assessment.   *Id.* at 954-55.   Dr. Kirkland stated that his first meeting with Petitioner lasted an hour and thirty minutes and his second meeting lasted approximately forty minutes.   *Id.* at 954.   Dr. Kirkland indicated that he (1) did not interview anyone who had known Petitioner concerning his day-to-day behavior, (2) did not speak with any witnesses regarding Petitioner's behavior during or after the murder in California, and (3) did not review any medical records or records from the California case.   *Id.* at 954.   Dr. Kirkland said that he only considered information given to him by

32

26

Petitioner. *Id.* Dr. Kirkland testified that Petitioner's paranoia related to his idea that Darla Peede was posing in swinger magazines. *Id.* at 955. Dr. Kirkland opined that Petitioner was able to appreciate the consequences of his actions at the time of the murder. *Id.* at 956.

DuRocher offered thirteen letters into evidence from Petitioner's friends and family members. The letters generally indicated that Petitioner was courteous and considerate, came from a good family, and requested mercy. (Ex. A-11.) One letter also noted that Petitioner had health problems as a child. *Id.*

In closing argument, the prosecutor noted that Dr. Kirkland's opinion was reached based solely on his examination of Petitioner. *Id.* at 962. DuRocher argued that the jury should consider as mitigation (1) the thirteen letters asking for mercy, (2) Petitioner was suffering from a serious mental disturbance at the time of the offense, (3) Petitioner is a father who provided for his children, (4) Petitioner had an unhappy life and unhappy marital relationship, and (5) Petitioner's parents were deceased. *Id.* at 965-67. DuRocher stated that Dr. Kirkland could not examine Petitioner's records from mental hospitals and other such records because they did not exist. *Id.* at 965-66.

ii.    *Rule 3.850 Evidentiary Hearing*

At the Rule 3.850 evidentiary hearing, Nancy Wagoner ("Wagoner"), Petitioner's aunt, testified about his childhood. (Ex. E-14 at 222.) Wagoner indicated that Petitioner, who was an only child, had a severe skin condition as a child that caused

33

blistering and impeded his ability to walk.    *Id.* at 234-35.    She further stated that Petitioner suffered from scoliosis at the age of twelve, which required him to wear braces. *Id.* at 243.    Wagoner testified that Petitioner's mother spanked him sometimes when he would make mistakes on his homework, but Wagoner said Petitioner's mother did not beat him.    *Id.* at 238.    According to Wagoner, Petitioner married his first wife at the age of sixteen and the couple had a baby shortly thereafter.    *Id.* at 244-46.    Petitioner's first wife left him approximately one year after they married, and Petitioner subsequently married Geraldine Peede and had two children with her.    *Id.* at 245-46.    Wagoner testified that Petitioner's mother committed suicide, and Petitioner blamed himself for her death.    *Id.* at 248-49.    Wagoner said that Petitioner changed after his mother's death, and approximately one year after she died, he moved to California.    *Id.* at 250-51.

After Petitioner was convicted of second-degree murder and assault in California, Wagoner visited Petitioner at which time he was crying and told her to leave because "they were going to kill" her.    *Id.* at 252.    Wagoner further indicated that Petitioner gave her a magazine which he thought contained a picture of Geraldine Peede posing nude.    *Id.* at 253.    Wagoner testified that Petitioner caused her to fall when he pushed her during an argument shortly before he murdered Darla Peede.    *Id.* at 256.    Finally, Wagoner stated that she had been willing to testify at Petitioner's trial, but no one asked her to do so.    She also noted that Petitioner had a great aunt who was mentally ill.    *Id.* at 257.

34

John Bell ("Bell"), a childhood friend of Petitioner, was called as a witness. During Bell's testimony, Petitioner accused him of sleeping with Geraldine and fathering Petitioner's youngest son.   *Id.* at 273-76.   After Bell exited the courtroom, Petitioner told the court that he would like to have a gun and for Bell to return.   *Id.* at 274.   Petitioner subsequently waived his appearance from the hearing and told the court that he was completely opposed to what counsel was doing.   *Id.* at 277-89.   Bell then testified that Petitioner did not have a lot of friends as a child and was teased as a result of his skin condition.   *Id.* at 291-92.   Bell said that Petitioner had a bad temper growing up, would get very angry, and had outbursts over a variety of issues.   *Id.* at 295.   Bell testified that in 1981, Petitioner, who was behaving wildly, falsely accused him of sleeping with Geraldine Peede, causing Bell to be cautious of Petitioner.   *Id.* at 296-97, 303, 306.   Bell indicated that after Darla Peede's murder, he did not want to be associated with Petitioner and laid low.   *Id.* at 308.

Michael Brown ("Brown"), Petitioner's cousin, testified that he, Petitioner, and another cousin, were very close as children and spent summers together.   *Id.* at 311-12. Brown stated that Petitioner suffered from blisters that prevented him from playing sports.   *Id.* at 313.   Brown said that as a teenager, Petitioner was overly aggressive with women and would get mad and make disparaging remarks if they spurned his advances. *Id.* at 315.   Brown further recounted instances not involving women in which Petitioner became angry and acted aggressively and irrationally.   *Id.* at 315-317, 319-20.   Petitioner

35

also falsely accused Brown of sleeping with Geraldine Peede. *Id.* at 320. Brown indicated that he was never contacted by Petitioner's attorneys prior to his trial and had he been contacted, he would have been willing to testify. *Id.* at 321.

DuRocher testified that he began representing Petitioner in late 1983, along with Theotis Bronson ("Bronson"), who had been representing Petitioner throughout the case. (Ex. E-15 at 378-84.)   DuRocher and Bronson conveyed a plea offer of life imprisonment to Petitioner, which he rejected. *Id.* at 383-84. Thereafter, Bronson served as lead counsel. *Id.* at 384-85. DuRocher indicated that an investigator contacted, interviewed, and took statements from individuals prior to DuRocher entering the case. *Id.* at 385. DuRocher stated that Petitioner was the most difficult client he ever represented and did not assist counsel during the trial. *Id.* at 397, 399.

DuRocher handled the penalty phase of the trial. Although he knew that preparation for the penalty phase should have begun when the case was received, DuRocher testified that he had not prepared for Petitioner's penalty phase prior to trial. *Id.* at 391-93, 405. Instead, after the guilt phase and two weeks before the penalty phase, the defense contacted Dr. Kirkland to evaluate Petitioner for the purpose of developing mitigation evidence. *Id.* at 394, 401-02. DuRocher did not furnish Dr. Kirkland with any background records, police reports, or names of witnesses to assist in his evaluation of Petitioner, nor did he provide the investigator with names of any specific individuals to locate. *Id.* at 394, 402-03.

36

30

DuRocher testified that he knew of the prior California convictions but did not recall reviewing the police report regarding the case.  *Id.* at 407, 457.  More specifically, DuRocher did not recall seeing the 1978 statements of John Bell, Eleanor Bell, or Richard Bateman, Petitioner's friends, which were part of the California police report.  *Id.* at 408-09.  DuRocher recalled communicating with one of Petitioner's uncles and Nancy Wagoner and learning that Petitioner had a normal upbringing.  *Id.* at 410, 432. DuRocher indicated that the defense was trying to overcome the aggravating circumstance of the prior murder but that they could not come up with much evidence to do so.  *Id.*

DuRocher conceded that at the time of the penalty phase, he did not know of Petitioner's skin condition, scoliosis, discipline by his mother, alcohol and drug abuse, mother's suicide, or feeling of responsibility for her death.  *Id.* at 411-12.   However, notes contained in the file referenced the suicide of Petitioner's mother.  *Id.* at 443-44. DuRocher indicated that they were not able to find witnesses to show Petitioner's deteriorating mental status and that such witnesses would have been highly relevant. *Id.* at 444.  DuRocher noted that at the time Petitioner was tried, presenting evidence other than statutory mitigation was novel.  *Id.* at 434.

Bronson testified that he had never tried a death penalty case prior to Petitioner's case.  *Id.* at 451.  Bronson stated that he did not recall seeing the California police report, but he knew about the offense and that Petitioner asserted a claim of self-defense.  *Id.* at

37

31

457.    Like DuRocher, Bronson could not recall seeing the 1978 statements of John Bell, Eleanor Bell, or Richard Bateman.    *Id.* at 458.    Bronson indicated that Petitioner wanted the case to proceed to trial quickly, resisted counsel's efforts to prepare the case, and maintained he wanted to be executed.    *Id.* at 459.    Bronson stated that he brought DuRocher into the case to assist him in obtaining information from Petitioner that could be used in mitigation because Petitioner would not communicate such information to him.    *Id.* at 462.    Bronson knew, however, from Nancy Wagoner about the suicide of Petitioner's mother and that it had impacted Petitioner.    *Id.* at 473-74.    Bronson also recalled that in July 1983, the investigator spoke with, and prepared a statement from, Delmar Brown, Petitioner's uncle, wherein Brown said that Petitioner appeared to have mental problems starting around the time of the murder in California, but he never received any treatment.[6]    *Id.* at 482.    Bronson stated that he did not know about Petitioner's skin condition as a child.    *Id.* at 471.    Bronson did not recall what information, if any, he provided to Dr. Kirkland, including information that Petitioner was described as having several or split personalities and that his mother had committed suicide.    *Id.* at 469-70, 492-93.    Bronson said that Petitioner never specifically forbade

---

[6] The investigator's note reflects that Delmar Brown was leery of speaking to the investigator and made the investigator promise he would not tell Petitioner what he had said.    (Doc. No. 23 at 163.)    Delmar Brown told the investigator that he thought Petitioner had mental problems which began when he killed a man in California, but he could not give any specifics concerning Petitioner's actions because he had not seen Petitioner often in the preceding years.    *Id.*

38

him from presenting evidence during the penalty phase.   *Id.* at 472.

Dr. Faye Sultan, a clinical psychologist, testified that she interviewed Petitioner on three occasions, spoke to numerous friends and family members of Petitioner and two of the attorneys associated with the California case, and read the California police report and interview notes from 1987.   (Ex. E-19 at 587-91.)   Dr. Sultan stated that Petitioner told her that he felt responsible for his mother's suicide in 1977 and said he was not the same after her death.   *Id.* at 605.   Petitioner believed that Darla Peede had posed in a swinger magazine with Geraldine Peede and was having sex with other men.   *Id.* at 609-16.   Shortly before Darla Peede's murder, he became violent towards her and began to drink and smoke marijuana heavily, which made him very paranoid.   *Id.* at 609-12.

Dr. Sultan noted that she interviewed Wagoner, who told her that Petitioner had two family members who were psychologically impaired and that Petitioner's mother and father were alcoholics.   *Id.* at 620-21.   Dr. Sultan stated that prior to his California convictions, Petitioner went home to North Carolina and his relatives described him as violent and out of touch with reality.   *Id.* at 623.   Dr. Sultan testified that Petitioner said that he told his California attorneys that he thought he was going crazy, but he did not receive any psychiatric treatment while incarcerated.   *Id.* at 608-09.   She further noted that Wagoner's description of Petitioner while in prison in California was evidence of his deteriorating psychological condition.   *Id.* at 622.

Dr. Sultan testified that if Dr. Kirkland did not review collateral information, then

39

33

Case 6:08-cv-00732-ACC-KRS   Document 34   Filed 02/27/15   Page 40 of 76 PageID 540

his evaluation of Petitioner was deficient.    *Id.* at 634-35.    Dr. Sultan diagnosed Petitioner with Delusional Disorder, Jealous Type and Paranoid Personality Disorder. *Id.* at 639-52.    As explained by Dr. Sultan, her diagnosis of Paranoid Personality Disorder was premised on:

> [A]ll of his relatives, the people that I've talked with, and [Petitioner] himself, have said that from the early days of his adulthood, late adolescence, [Petitioner] has been suspicious, has wondered about the motives of other people, has been easily agitated, has been easy to anger, has frequently, acting out of his belief that other people are going to hurt him, done unusual, aggressive acts, done unusual, self-mutilating acts. It's a pretty consistent picture, I think.

*Id.* at 653.    She stated that Petitioner was paranoid at the time of the California murder. *Id.* at 670, 693; Ex. E-20 at 748.

On cross-examination, Dr. Sultan admitted that Dr. Kirkland described Petitioner as suffering from paranoid disorder.    Ex. E-19 at 664-65.    Dr. Sultan believed that Petitioner qualified for the statutory mitigators of (1) inability to conform his behavior to the law and (2) the murder was committed while under the influence of extreme mental or emotional disturbance.    *Id.* at 657-59.    Dr. Sultan indicated that non-statutory mitigation included Petitioner's poor self-esteem, struggle with depression, substance abuse, childhood illnesses, emotional and physical abuse as a child, his mother's suicide, and extreme remorse.    *Id.* at 661-64.

Dr. Brad Fisher, a clinical psychologist, testified that he evaluated Petitioner in 2000 to determine his competency and in 2003 to determine his overall psychological

40

34

condition.  (Ex. E-20 at 777-79.)   Dr. Fisher diagnosed Petitioner as suffering from "a Delusional Disorder of a paranoid jealous type...."   *Id.* at 784, 820.   Dr. Fisher indicated that he felt Dr. Kirkland's testimony was deficient because although he discussed Petitioner's paranoia and delusion, he did not explain how they related to the crime.   *Id.* at 790-91.   Dr. Fisher concluded that Petitioner was delusional at the time of the murder and that both statutory mental health mitigators of extreme emotional disturbance and inability to conform conduct applied.   *Id.* at 787, 197.   Dr. Fisher stated that the background information Petitioner provided was reliable except for the area in which he was delusional.   *Id.* at 806.   Dr. Fisher further noted that there was no indication that Petitioner suffered from schizophrenia, despite a reference to such a diagnosis while Petitioner was incarcerated in California.   *Id.* at 817.   Dr. Fisher also stated that Petitioner may have been suffering from some delusional thinking when he shot the people in California, but he did not know because the shootings in California were "a very different event" from Petitioner's loss of contact with reality during Darla Peede's murder.   *Id.* at 798-99.

Dr. Sidney Merin, a psychologist called by the State, testified that Petitioner would not allow Dr. Merin to examine him.   (Ex. E-21 at 875-83.)   However, Dr. Merin reviewed numerous records and diagnosed Petitioner with a Paranoid Personality Disorder with borderline antisocial features.   *Id.* at 892.   Dr. Merin indicated that Petitioner did not suffer from a delusional disorder and opined that Petitioner knew the

41

Case 6:08-cv-00732-ACC-KRS  Document 34  Filed 02/27/15  Page 42 of 76 PageID 542

wrongfulness of his actions when he murdered Darla Peede and was capable of conforming his behavior to the requirements of the law. *Id.* at 893-900. Dr. Merin indicated that the murder in California did not have anything to do with delusions, but the California incident supported his conclusion that Petitioner suffered from Paranoid Personality Disorder. *Id.* at 904-06. Dr. Merin further noted that there was no evidence that Petitioner was schizophrenic. *Id.* at 894. Dr. Merin disagreed with Dr. Kirkland's finding of the emotional distress mitigator because

> [t]o experience severe and emotional distress that would prompt an individual to kill somebody else, this mental and emotional distress would have to be beyond, over and above, the normal behavior of this individual, so-called normal behavior. . . . [Petitioner] had always been this type of individual, an angry, aggressive individual who was unsatisfied with a lot of things.

*Id.* at 907-08. Dr. Merin testified that in 1984 it would have been typical for a psychiatrist to interview the client, take his or her history, and do a mental health status examination, as Dr. Kirkland did. *Id.* at 911-12. Dr. Merin further stated that no manual existed in 1984 that gave the parameters for what constituted an adequate examination. *Id.* at 925. Dr. Merin agreed, however, that Dr. Kirkland did not explain to the jury the events of Petitioner's background, including the suicide of Petitioner's mother and his skin condition. *Id.* at 946-47. Dr. Merin disagreed with Dr. Kirkland's finding of a statutory mitigator but stated Dr. Kirkland's diagnosis that Petitioner had a paranoid disorder was consistent with his diagnosis. *Id.* at 912-13.

Dr. David Frank, a psychiatrist called by the State, testified that he interviewed

42

Petitioner three times and spent approximately nine hours with him. *Id.* at 957-62. Dr. Frank diagnosed Petitioner with Delusional Disorder, Jealous Type, and a personality disorder with antisocial and borderline features or traits. *Id.* at 967-68. Dr. Frank opined that neither mental illness prevented Petitioner from knowing the wrongfulness of his actions. *Id.* at 969-70. In support of his opinion, Dr. Frank relied on the facts that Petitioner tried to take Darla Peede to the hospital, tried to hide her body, and was afraid of being caught. *Id.* Dr. Frank believed that the statutory mitigator that the murder was committed while Petitioner was under extreme mental and emotional disturbance applied but did not believe that the statutory mitigator of inability to conform his behavior to the law applied. (Ex. E-22 at 986-87, 992.) Dr. Frank stated that he did not observe any evidence of Paranoid Personality Disorder. *Id.* at 1002-04. Dr. Frank also noted that the DSM III, which was used in 1984, included a paranoid disorder, which is now called a delusional disorder. *Id.* at 1010.

### iii.    Consideration of Claim

Petitioner maintains that had counsel adequately investigated and provided background evidence to Dr. Kirkland or called witnesses to testify regarding his background, then the jury could have considered mitigation evidence that (1) Petitioner suffered a severe skin condition and scoliosis as a child, (2) Petitioner suffered physical abuse as a child, (3) his mental health began to deteriorate after his mother committed suicide, (4) he was suffering from a mental illness at the time he committed the prior

43

Case 6:08-cv-00732-ACC-KRS   Document 34   Filed 02/27/15   Page 44 of 76 PageID 544

felony convictions in California, (5) at the time of the murder he was unable to conform

his conduct to the law based on his mental impairment (statutory mitigator), and (6) at

the time of the murder he was under the influence of extreme emotional and mental

disturbance (statutory mitigator).    Petitioner contends that the state court's denial of this

claim is contrary to, or an unreasonable application of, *Strickland*, and its progenies -

*Wiggins v. Smith*, 539 U.S. 510 (2003) and *Rompilla v. Beard*, 545 U.S. 374 (2005).

As explained by the Eleventh Circuit,

> "Establishing that a state court's application of *Strickland* was
> unreasonable under § 2254(d) is all the more difficult."    *Id.* at 788. "Where
> the highly deferential standards mandated by *Strickland* and AEDPA both
> apply, they combine to produce a doubly deferential form of review that
> asks only whether there is any reasonable argument that counsel satisfied
> *Strickland*'s deferential standard." *Downs v. Sec'y, Fla. Dep't of Corr.*, 738 F.3d
> 240, 258 (11th Cir. 2013) (quotation marks omitted), *pet. for cert. filed*, No. 13–
> 1356 (U.S. May 8, 2014).    "The question is not whether a federal court
> believes the state court's determination under the *Strickland* standard was
> incorrect   but   whether   that   determination   was   unreasonable—a
> substantially higher threshold."    *Knowles*, 556 U.S. at 123, 129 S. Ct. at 1420
> (quotation marks omitted).   If there is "any reasonable argument that
> counsel satisfied *Strickland*'s deferential standard," then a federal court may
> not disturb a state court decision denying the claim.    *Richter*, 131 S. Ct. at
> 788.

*Mendoza v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1213, 1236 (11th Cir. 2014).    Furthermore,

when the petitioner asserts that his trial counsel "should have done something more,

[federal courts] first look at what the lawyer did in fact."    *Id.* at 1237 (quoting *Bishop v.*

*Warden, GDCP*, 726 F.3d 1243, 1257 (11th Cir. 2013)).    To determine whether a reasonable

probability exists that the petitioner would have received a different sentence absent

44

counsel's performance, "a reviewing court must 'consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding—and reweigh it against the evidence in aggravation.'" *Debruce v. Comm., Ala. Dep't of Corr.*, 758 F3d 1263, 1267 (11th Cir. 2014) (quoting *Porter v. McCollum*, 558 U.S. 30, 41 (2009)).

The Eleventh Circuit has noted that "*Williams, Wiggins, Rompilla,* and *Porter* . . . do not provide separate standards and rules governing attorney competence; rather, they provide illustrative 'application[s] of the principles elucidated in *Strickland* to a novel set of facts.'" *Anderson v. Sec'y, Fla. Dep't of Corr.*, 752 F.3d 881,903 (11th Cir. 2014) (quoting *Newland v. Hall*, 527 F.3d 1162, 1197 (11th Cir. 2008)). Therefore, these cases are relevant only to the extent they might show that "counsel, confronted with circumstances like those presented at the time and place of [the petitioner's] trial, failed to adhere to the standard of reasonable representation." *Id.* at 904.

In *Rompilla,* the Court determined that counsels' performance was constitutionally deficient because they failed to examine the record in petitioner's prior felony cases, which would have revealed life history mitigation evidence. 545 U.S. at 383. Counsel's duty to review the prior felony case stemmed from their knowledge the prosecutor would use the petitioner's history of felony convictions and violence as an aggravator in support of the death penalty. *Id.* "Thus, *Rompilla* stands for the proposition that a reasonably competent counsel will investigate a prior felony conviction it knows the prosecution will

45

rely upon in seeking the death penalty." *Blankenship v. Hall*, 542 F.3d 1253, 1277 (11th Cir. 2008).

*Wiggins* involved a case in which counsel failed to consider possible mitigation strategies despite being on notice of their existence. Counsel received a one-page description of the petitioner's personal history in the presentence report, which included reference to the petitioner's "misery as a youth" and described his background as "disgusting." *Wiggins,* 539 U.S. at 523 (internal quotation marks omitted). Counsel further had a record from the department of social services which indicated that the petitioner's mother "was a chronic alcoholic," the petitioner "was shuttled from foster home to foster home," and "on at least one occasion, [the petitioner's] mother left him and his siblings alone for days without food." *Id.* at 525. Counsel did not investigate these leads although "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses." *Id.*

The record in this case demonstrates that prior to the penalty phase either defense counsel or an investigator had spoken to Petitioner, Delmar Brown, and Nancy Wagoner about Petitioner's background. From these individuals, information was obtained that Petitioner's mother had committed suicide, her death had a significant impact on Petitioner, his family questioned his mental condition as early as the time of his California convictions, and Petitioner felt he had a split personality. *See, e.g.,* App E-30 at 163-64,

46

40

Case 6:08-cv-00732-ACC-KRS   Document 34   Filed 02/27/15   Page 47 of 76 PageID 547

180, 190.    Although defense counsel was aware that the California convictions would be offered as an aggravating factor, defense counsel did not review the statements of John Bell, Eleanor Bell, or Richard Bateman contained in the California police report, in which they noted *inter alia* the suicide of Petitioner's mother, a change in his personality/mental health, and his skin condition and scoliosis as a child.    *See, e.g.,* E-30 at 68, 74, 82. Moreover, there is no indication that counsel provided any records, statements, or information they had obtained concerning Petitioner's background to Dr. Kirkland. Thus, counsel either knew or should have known that Petitioner suffered from childhood illnesses, his mother's suicide substantially impacted him, and his mental health was in question prior to the California offenses.

Had counsel provided this information to Dr. Kirkland or called witnesses to testify regarding Petitioner's family history, childhood, and behavior prior to, and after, the California convictions, the jury would have heard substantially more mitigation evidence than was presented at the penalty phase.    The jury would have heard that Petitioner's parents were alcoholics and that Petitioner's childhood illnesses impacted his ability to participate in childhood activities and to develop social relationships. Evidence further could have been presented in mitigation of the California murder, namely that the shooting was indicative of Petitioner's diagnosis of Paranoid Personality Disorder as opined by Dr. Sultan (Petitioner's expert witness) and Dr. Merin (the State's expert witness).

47

41

The Supreme Court of Florida concluded that counsel was not deficient in part because Dr. Kirkland was able to provide favorable testimony for Petitioner without the benefit of this evidence.    This determination, however, ignores the fact that the prosecution attacked Dr. Kirkland's testimony because his opinion was premised solely on the information self-reported by Petitioner during their two brief meetings.    (Ex. A-6 at 953-54.)    The prosecution undermined the credibility of Dr. Kirkland's opinion based on his failure to review any records or interview anyone to ascertain Petitioner's behavior before or after Darla Peede's murder.    *Id.*    Moreover, although Petitioner was a difficult client, he did not prohibit counsel from presenting mitigation evidence at the penalty phase or from providing relevant records and statements to Dr. Kirkland.    The Court concludes that the Supreme Court of Florida's determination that counsel did not render deficient performance is an unreasonable application of *Strickland* as illustrated by *Rompilla.*

Turning to the prejudice analysis, in concluding no prejudice resulted, the Supreme Court of Florida determined (1) the mitigation evidence presented at the evidentiary hearing would have been countered by negative aspects of Petitioner's character as brought out by the mitigation witnesses, (2) Dr. Kirkland's essential views would not have changed based on additional background information and Dr. Kirkland was still able to find the extreme mental or emotional disturbance mitigator, and (3) two substantial aggravators were found by the trial court.

48

42

Although negative aspects of Petitioner's character, such as his volatile temper and violent behavior, would have been presented had counsel called Wagoner, Bell, and Brown as witnesses, this evidence seemingly would have supported Drs. Sultan and Merin's diagnosis that Petitioner suffered from a Paranoid Personality Disorder and Drs. Fisher, Sultan, and Frank's diagnosis that he suffered from Delusional Disorder.   For instance, when Bell testified, Petitioner became irate and subsequently stated he would like to shoot Bell.   Petitioner's behavior, however, was the result of his delusion that Bell and others, including Petitioner's family members, had slept with Geraldine Peede. Further, Brown's testimony that Petitioner became angry and acted aggressively and irrationally could have been viewed as indicative of Paranoid Personality Disorder or Delusional Disorder.   Consequently, even though negative aspects of Petitioner's character would have been admitted if these witnesses had testified at the penalty phase, this evidence largely would have supported the mental health experts' testimony and not countered the mitigation evidence.   Moreover, Dr. Kirkland actually commented on similar negative characteristics of Petitioner at the penalty phase when he said that Petitioner "has certain, certain type of character structure that . . . he's sort of a tough guy, macho, explosive at times."   Thus, the jury had already been presented with some of these negative characteristics without any possible medical explanation for their existence.

With respect to Dr. Kirkland's testimony, the Court agrees that there is no

49

Case 6:08-cv-00732-ACC-KRS   Document 34   Filed 02/27/15   Page 50 of 76 PageID 550

indication that the additional evidence would have changed his opinion that Petitioner suffered from paranoia regarding the infidelity of his wives, which was consistent with the other mental health experts' diagnoses of Delusional Disorder.    Nevertheless, had these witnesses testified or had the content of their statements or the statements contained in the California case file been provided to Dr. Kirkland, he could have determined that Petitioner also suffered from Paranoid Personality Disorder.    Additionally, Dr. Kirkland would have been apprised that Petitioner's family had a history of mental illness and that Petitioner's mental health had been in deterioration since his mother's suicide.    Notably, Dr. Kirkland could have offered an opinion regarding Petitioner's mental health at the time of the California murder.    Like Dr. Merin and Dr. Sultan's testimony, such evidence likely would have mitigated, and thus presumably lessened the weight attributed to, one of the two aggravators.

The total mitigation evidence after the evidentiary hearing included that Petitioner suffered from childhood illnesses, his parents were alcoholics, his mental health began to deteriorate after his mother's suicide, he suffered from Paranoid Personality Disorder and Delusional Disorder, he had a family history of mental illness, and he was behaving bizarrely prior to, and after, the California murder.    Petitioner's post-conviction experts opined that Petitioner qualified for the statutory mitigator that he was unable to conform his conduct to the requirements of the law at the time of the offense.    In contrast, the State's expert witnesses determined that Petitioner did not qualify for this statutory

50

44

mitigator.   Even discounting this statutory mitigator, however, one statutory mitigator was found to apply, the extreme mental or emotional disturbance mitigator.   Had the aforementioned additional mitigation evidence been presented, a reasonable probability exists that the jury would have determined that the prior violent felony aggravator (California convictions) was mitigated, and thus warranted less weight.   When considered with the remaining aggravator, that the murder occurred during the commission of a kidnapping, the aggravators were balanced or outweighed by the total mitigation evidence.   In short, "[t]his is not a case in which the new evidence would barely have altered the sentencing profile presented to the sentencing judge." *Porter*, 558 U.S. at 41 (internal quotation marks omitted).   Instead, if the additional mitigation witnesses had testified about Petitioner's background or had such information been provided to Dr. Kirkland, it would have enabled counsel to present a different picture of Petitioner than the one created by the sole mitigation witness, Dr. Kirkland, who testified at the penalty phase.   Reweighing the evidence in aggravation against the totality of available mitigating evidence, the Court concludes that a reasonable probability exists that Petitioner would have received a different sentence absent counsels' failure to investigate and present additional mitigation evidence.   Consequently, the Supreme Court of Florida's denial of this claim was an unreasonable application of *Strickland*. Accordingly, habeas relief is granted as to claim three.

51

45

Case 6:08-cv-00732-ACC-KRS    Document 34    Filed 02/27/15    Page 76 of 76 PageID 576

2.    The Court determines that claims one, two, and four through nine are without merit.   Habeas relief is DENIED **with prejudice** with regard to these claims.

3.    The writ of habeas corpus will be conditionally GRANTED with regard to claim three, for the reasons discussed above, within NINETY (90) DAYS from the date of this Order, unless the State of Florida initiates new sentencing proceedings in state court consistent with the law.

4.    The Clerk of the Court shall enter judgment accordingly and is directed to close this case.

DONE AND ORDERED in Orlando, Florida, this 26th day of February, 2015.

ANNE C. CONWAY
United States District Judge

Copies to:
Counsel of Record

76

46